IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JADA JOHNSON                              :
                                          :          CIVIL ACTION
          v.                              :
                                          :          NO. 07-5545
SJP MANAGEMENT LLC, ET AL.                :

**SURRICK, J.**                                    **FEBRUARY  12 , 2009**

### MEMORANDUM & ORDER

This is a diversity action alleging negligence against a property management company

and an elevator maintenance company arising out of injuries allegedly suffered by Jada Johnson

("Plaintiff") when elevator doors closed on her arm.  Presently before the Court are Defendants'

*Daubert* Motions to Preclude Plaintiff's Expert, Ronald D. Schloss, from Testifying at Trial

(Doc. Nos. 25, 28), and Defendants' Motions for Summary Judgment (Doc. Nos. 22, 23).  For

the following reasons, the Motions will be granted.

## I.      FACTUAL BACKGROUND

In 2005, Plaintiff worked for BISYS Retirement Services, a business located in a four-

story office complex known as the Montgomery Corporate Center in Dresher, Pennsylvania.

(*See* Pl.'s Dep. 17; Pl.'s Interrog. ¶¶ 3, 11; Aff. of David Wess ¶¶ 1, 6.)  The Montgomery

Corporate Center is a modern office complex that was constructed in 2002 and outfitted with

3,500 lb-capacity hydraulic passenger elevators.  (*See* Doc. No. 23, Def. SJP's Mot. for Summ. J.

¶ 2.)  The elevators feature a door re-opening device called the Lambda 3-D entrance protection

system, a state-of-the-art technology that uses infrared beams and detectors that "create an

invisible safety net across the elevator entrance" designed to prevent the doors from closing on

passengers.  (*See id.*, Ex. 3, Unitec Info. Sheet; *see also id.*, Ex. 15, Expert Report of Jon B.

Halpern 2.)  The Lambda 3-D system has two modes of protection.  (*See* Expert Report Supp. of Jon B. Halpern 1.)  The first is a set of 56 infrared beams that projects across the door opening. (*Id.*)  When the beams are obstructed, the controller signals the doors to stay open.  (*Id.*)  The second, 3-D mode of protection is a set of 12 beams that projects out from the elevator doors at 45 degree angles.  (*Id.*)  When an object moves toward the door and obstructs the beams, the controller signals for the doors to stay open.  (*Id.*)  If any beam in the curtain is interrupted, "the Lambda system reopens the elevator door instantly – without touching passengers."  (Doc. No. 23, Ex. 3, Unitec Info. Sheet.)  The 3-D protection is automatically disabled when the doors begin to close, because the movement of the doors causes the system to sense an approaching obstruction.  (*See* Schloss Dep. 247-48; Halpern Report Supp. 1.)[1]  Elevators using Lambda 3-D technology do not require contact with an object or person to signal the doors to re-open, unlike mechanical devices that detect obstructions in the path of the doors only when the leading edge of the door makes contact with a person or object.  (*See* Doc. No. 23, Ex. 17, Expert Report of Thomas R. Davies 2.)  If the Lambda 3-D system malfunctions, the elevator doors stay open and do not close.  (Schloss Dep. 248; Davies Report 3.)

In January 2005, the owner of the Montgomery Corporate Center entered into a property management contract with SJP Management, LLC ("Defendant SJP").  (*See* Doc. No. 23, Ex. 1, Contract between the Montgomery Corporate Center and Def. SJP ¶ 3.2.5, Jan. 5, 2005.) Pursuant to the property management contract, Defendant SJP manages, operates, and supervises

---

[1] There is no dispute that once the elevator doors have closed to a certain point – a "very small distance" – the doors will close regardless of whether an obstruction is present.  (Schloss Dep. 176.)  There is also no dispute that if an obstruction is placed between the outer doors, the "hoistway doors," without breaking the infrared beam inside, there would be no reason for the hoistway doors to reopen.  (*Id.* at 181-82.)

the Montgomery Corporate Center, including the elevators.  (*Id.*)  The property management

contract requires that Defendant SJP "negotiate contracts with independent contractors for . . .

elevator . . . maintenance."  (*Id.* ¶ 3.2.5.5.)  Defendant SJP entered into a maintenance contract

with Otis Elevator Company ("Defendant Otis") to maintain the elevators.  (*See* Doc. No. 23, Ex.

2, Contract between Def. SJP and Def. Otis, May 3, 2002.)  The elevator maintenance contract

requires that Defendant Otis "periodically examine safety devices" and conduct a variety of

annual tests on the elevators.  (*Id.* at 3.)  The elevator maintenance contract also requires that

Defendant Otis install a microprocessor system that continuously monitors the elevators and

notifies a dispatching center if any elevator is inoperative.  (*Id.* at 5.)  The contract includes a

section titled "Shared Responsibility" that requires that Defendant SJP notify Defendant Otis

"immediately" via a 24-hour hotline if any one of the elevators malfunctions or is in a dangerous

condition.  (*Id.*)  Until the problem with the elevator is corrected, the contract requires Defendant

SJP to remove the elevator from service and "take all necessary precautions to prevent access or

use."  (*Id.*)

Plaintiff testified that on December 14, 2005, at "around 11:00 a.m.," she was in the

cafeteria on the ground floor of the Montgomery Corporate Center purchasing food items.  (Pl.'s

Dep. 58-59.)  Plaintiff worked on the second floor.  (*Id.* at 41.)  Because Plaintiff was carrying

paperwork and the food items that she had purchased from the cafeteria, Plaintiff decided to take

the elevator from the ground floor back to her desk on the second floor.  (*Id.*)  Plaintiff "was

hurrying to get to the elevator [and to] get on [it]" since she "wanted to get back up to [her]

desk."  (*Id.* at 61-62.)  At 11:17 a.m., Plaintiff pushed a button for the elevators and "a few

seconds" later the doors to Elevator No. 2 opened.  (*Id.* at 63; Doc. No. 23, Ex. 6, Elevator

Access Card Records.)  Plaintiff observed nothing unusual as the elevator doors opened.  (Pl.'s Dep. 65.)  However, in the "half of a second" that it took Plaintiff to step inside the elevator, the elevator doors "closed abruptly" and made contact with Plaintiff's left and right shoulders, causing her body to get "caught" in between the doors.  (*Id.* at 65, 78, 80.)  Both of Plaintiff's feet were inside the elevator as the elevator doors closed on her shoulders.  (*Id.* at 91.)  Plaintiff's body was "pinched" between the elevator doors in this position for "between one and three [seconds.]"  (*Id.* at 80, 89.)  Plaintiff then "jump[ed] right back out" of the elevator, and the elevator doors continued to close.  (*Id.* at 65, 78, 81, 91.)  The "last thing remaining" inside the elevator was Plaintiff's arm.  (*Id.* at 78.)  Plaintiff's hand and lower arm became "caught in the elevator" door.  (*Id.* at 81.)  Plaintiff's right arm remained stuck in the elevator doors from her elbow to her fingers for "about thirty or forty seconds."  (*Id.* at 65, 82-83, 89-90.)  Plaintiff used her left hand to pry open the elevator doors to release her right arm.  (*Id.* at 65.)  As a result of the doors closing, Plaintiff suffered injuries to her right hand and forearm.  (*Id.* at 66.)  Plaintiff is the only witness to the incident.[2]  (*Id.* at 53.)

The occurrence of which Plaintiff complains – sudden closing of elevator doors, without

---

[2] There are, however, individuals who spoke with Plaintiff after the alleged incident. Kate Malinowski, a former human resources representative at BISYS, testified that Plaintiff told her that "she put her arm in the elevator doors as they were closing." (Malinowski Dep. 8-9, 11.) Malinowski testified that, "I believe the language [that Plaintiff] used was she had put her arm in the elevator door." (*Id.* at 10.) Elizabeth Mark, a corporate trainer at BISYS, also testified that Plaintiff spoke with her about the incident. (Mark Dep. 6, 12-13.) Mark testified that "[Plaintiff] said she stuck her hand in the elevator to try to get the doors to open back up because it was closing." (*Id.* at 12.) Mark further testified that "[Plaintiff] mentioned that the doors were closing and she was trying to get them to reopen so she could step into the elevator." (*Id.* at 13.) Plaintiff denies that she used her hand to stop the elevator doors from closing. (*See* Doc. No. 30, Pl.'s Resp. ¶ 21.) We note this factual dispute for the record. Since we construe all the facts and inferences in the light most favorable to Plaintiff for purposes of this Motion, we accept Plaintiff's version of the events as true. *See* Fed. R. Civ. P. 56.

warning – had never happened before at the Montgomery Corporate Center.  Hundreds of employees utilize the elevators each day.  (Wess Aff. ¶ 3.)  Plaintiff herself used the elevators "thousands of times" prior to the alleged incident.  (Pl.'s Dep. 43.)  Plaintiff is not aware of any problems with the elevator doors at any time before the alleged incident:

> Q:     Had you ever had any problems with the opening or closing of the doors on
>        elevator number two . . . at any time before December 14, 2005?
> A:     No.
> . . .
> Q:     Are you aware of anyone having any problems with elevator number two
>        before December 14, 2005?  Yes or no?
> A:     No.
> Q:     Are you aware of any problems involving the opening or shutting of the
>        doors involving elevator number two before December 14, 2005?
> A:     No.
> Q:     Are you aware of anyone getting injured on any elevator on the first floor at
>        the Montgomery Corporate Center before December 14, 2005?
> A:     No.
> Q:     Are you aware of any problems with the mechanism, the sensory devices, the
>        infrared device, or any of the devices involving elevator number two at any
>        time before December 14, 2005?
> A:     No.
> . . .
> Q:     In the thousands of times that you rode these elevators, this is the only time
>        that the doors closed while you or anyone you were aware of was entering
>        the elevator?
> A:     Yes.
> . . .
> Q:     You don't know whether anyone ever complained to the elevator company
>        about this kind of incident happening before?
> A:     No.  I don't know of anyone else.  Ever.

(*Id.* at 47-48, 161-62.)  Prior to the incident Plaintiff had never reported any problems with the subject elevator to her employer or any other party.  (*Id.* at 48-49.)

There is no evidence in the record that anyone encountered a problem with the elevators similar to that encountered by Plaintiff.  David Wess, Defendant SJP's on-site property manager, submitted an affidavit that states "[p]rior to December 14, 2005, there were no reported incidents

of elevator doors closing rapidly, without warning, including Elevator No. 2" and "no reported

injuries caused by the elevator doors, including Elevator No. 2."  (Wess Aff. ¶¶ 4-5.)  Plaintiff's

co-workers testified similarly that they experienced no problems with the elevators prior to the

alleged incident and were aware of no one else who had.   For example, Plaintiff's supervisor,

Stephanie Szot, testified as follows:

> Q: Ms. Szot, have you, yourself, ever had any problems with the elevators in this building?
> A: No, I have not.
> Q: And have you specifically ever had any problems with elevator number two?
> A: No.
> Q: Has anyone ever reported to you any safety concerns regarding the elevators?
> A: No.
> Q: Has anyone ever reported to you the elevator doors suddenly and unexpectedly striking them?
> A: No.

(Szot Dep. 16-17.)  Plaintiff's co-workers Elizabeth Mark and Kate Malinowski offered similar

testimony and were aware of nobody other than Plaintiff who experienced a problem with the

elevators.  (*See* Mark Dep. 8; Malinowski Dep. 12.)

Plaintiff's Expert Ronald D. Schloss and various other experts reviewed the Elevator

Maintenance Records and Access Card Records and concluded that Elevator No. 2 required no

repairs or maintenance after the alleged incident in order to return the elevator to normal

operation.  (Schloss Dep. 223, 226-27; Dinoff Report 4; Davies Report 3.)  Schloss, who is the

Executive Director of SEEC, LLC, an engineering consulting firm, testified that he had no

evidence that the elevator door-close or -open circuitry was ever fixed or replaced as a result of

the accident.  (Schloss Dep. 223.)  After reviewing the Elevator Maintenance Records, Schloss

was unaware of any "remedial or corrective measures" that were required after the incident

involving Plaintiff.[3]  (*Id.* at 226-27.)  Lawrence C. Dinoff, an architect, observed that "the

elevator operated normally and continuously during the days of December 14, 2005 (the day of

the incident) and December 15, 2005, the following day, without any abnormal delays caused by

a failure or subsequent repair of [the elevator]."  (Dinoff Report 4.)  Thomas Davies, an elevator

repairman, observed that "[a]n electro-mechanical device will not fix or repair itself, yet there

was no prior similar events or malfunction found on the day of the incident or after the incident."

(Davies Report 3.)

     The elevator access cards for Elevator No. 2 show that the elevator was used, without a

problem, four minutes before Plaintiff used the elevator and again twelve minutes after Plaintiff

used it.  (*See* Wess Aff. ¶ 7; *see also* Doc. No. 23, Ex. 6, Elevator Access Card Records.)  In his

affidavit, Wess indicates that he used Elevator No. 2 "at 11:29 a.m." – twelve minutes after the

incident involving Plaintiff – "and did not experience any problems."  (Wess Aff. ¶ 7.)  Wess

was not alone.  Before the close of business on December 14, 2005, Elevator No. 2 was used

---

     [3] Accepting Plaintiff's version of the events as true, Schloss could not explain the
undisputed fact that no repairs or remedial measures were necessary to restore the elevator to
normal operation.  Schloss explained that he "would have to be an expert to do that":

    Q:     Can we agree that if there were a problem with the Lambda 3-D door
           detector, it would not fix itself?
    A:     No.
    Q:     We can't agree with that?
    A:     We cannot agree on that.
    Q:     It could just miraculously be better the next day?
    A:     Miraculously be better the next day.  You don't understand all the things that
           are involved in that.  I would have to be an expert to do that.
    Q:     Well, why don't you tell me what specifically was wrong with the Lambda
           3-D detector on the day of this accident, December 14, 2005?
    A:     I don't know.

(Schloss Dep. 247.)

more than 100 times after the incident involving Plaintiff.  (*See* Doc. No. 23, Ex. 6, Elevator

Access Card Records.)  No problems were reported, and no repairs were necessary.  (*See* Wess

Aff. ¶ 10.)  Defendant Otis was not notified of any problem with the elevator that would require

maintenance or repairs since the microprocessor system that monitors the elevators did not report

a malfunction.  (*See* Doc. No. 23, Def. SJP's Mot. for Summ. J. ¶ 14; *see also id.*, Ex. 4, Elevator

Maintenance Records.)

      To date, except for the incident involving Plaintiff, there have been "no reports of the

elevator doors suddenly and unexpectedly closing on anyone."  (Wess Aff. ¶ 10.)  The elevator

passed all state inspections without deficiencies, including a routine inspection on August 17,

2005, four months before the alleged incident.  (*See* Doc. No. 23, Ex. 5, Elevator Inspection

Records 2002-2005; Halpern Report 2-3.)  Defendant Otis observed no problems with the doors

closing in the course of its maintenance.[4]  (*See* Doc. No. 23, Ex. 4, Elevator Maintenance

Records; *see also* Schloss Dep. at 211-12, noting "routine inspection" by Defendant Otis in

September 2005.)

## II.    PROCEDURAL BACKGROUND

      On December 1, 2007, Plaintiff filed a one-count Complaint in the Philadelphia County

Court of Common Pleas alleging that Defendants SJP and Otis were negligent.[5]  (*See* Compl.)

---

[4] Maintenance records show that Defendant Otis "adjusted" the elevator doors before the
alleged incident on June 8, October 20, and October 31, 2005, in response to "call backs" by
Defendant Otis.  (Schloss Dep. 173; Davies Report 4.)  It is undisputed that "[n]one of the . . .
call backs had anything to do with a fast closing door or a bad door detector."  (Davies Report 4;
*see also* Schloss Dep. at 172-73, 213.)

[5] Plaintiff did not sue the elevator owner, CB Richard Ellis Investors, LLC.  (*See* Compl.)
On March 6, 2008, Defendant SJP filed a third party complaint against the elevator owner.  (*See*
Doc. No. 11.)  On September 10, 2008, Defendant SJP withdrew its third party complaint.  (*See*

Plaintiff alleged that Defendants "knew or should have known" that the elevator doors were a "dangerous and hazardous condition," and that Defendants failed to (1) warn Plaintiff of the condition, (2) repair the condition, and (3) properly inspect and maintain the elevators.[6] (Compl. ¶ 9a-h.)  On December 26, 2007, Defendants removed the action to this Court, which has diversity jurisdiction pursuant to 28 U.S.C. § 1332.[7]  (*See* Doc. No. 1.)

Plaintiff intends to call Ronald Schloss as her expert witness at trial.  In his expert report Schoss states that "the primary cause of [Plaintiff's] incident and subsequent injuries was improper preventive maintenance by Otis Elevator Company."  (Schloss Report 3.)  Defendants contend that Schloss's opinion "is not based upon sufficient facts or data" and "is the result of no 'principles and methods' of any kind."  (Doc. No. 28, Def. Otis's Mem. in Supp. of Mot. to Preclude 3; *see also* Doc. No. 25, Def. SJP's Mot. to Preclude ¶ 1.)  Defendants filed the instant *Daubert* Motions to Preclude Plaintiff's Expert, Ronald D. Schloss, from Testifying at Trial.

---

Doc. No. 21.)  The elevator owner is no longer a party in this case.

[6] Plaintiff does not contend and has not argued that the elevator doors were defectively designed or defectively manufactured.  Plaintiff contends that the doors were negligently maintained thus creating a dangerous and hazardous condition.

[7] The parties agree that jurisdiction is properly based on diversity.  *See* 28 U.S.C. § 1332. Congress has vested the district courts with "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States[.]"  *Id.*  A business organized as a corporation, for purposes of diversity jurisdiction, is "deemed to be a citizen of any State by which it has been incorporated" and, since 1958, also "of the State where it has its principal place of business."  *Id.* § 1332(c)(1).  Defendants are businesses that are organized as corporations and alleged to be incorporated in New Jersey with their principal places of business in an unspecified state other than Pennsylvania.  (*See* Doc. No 1 ¶ 1.)  Plaintiff is alleged to be a citizen of Pennsylvania.  (*Id.* ¶ 2.)  There is complete diversity among the parties.  *See* 28 U.S.C. § 1332(a); *see also Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996) (noting that the statute requires complete diversity between all plaintiffs and all defendants).  The amount in controversy exceeds $75,000.00, exclusive of interest and costs.  *See* 28 U.S.C. § 1332(a).

(*See* Doc. Nos. 25, 28.)

Defendants also filed the instant Motions for Summary Judgment.  (*See* Doc. Nos. 22, 23.)  Defendants contend that Plaintiff fails to establish a negligence claim since there is no evidence that either Defendant had notice of any defects or malfunctioning of the elevator in question, no evidence that the elevator door failed to work properly, and no evidence that either Defendant caused the alleged incident.  (*See* Doc. No. 23, Def. SJP's Mot. for Summ. J. ¶ 1; Doc. No. 22, Def. Otis's Mot. for Summ. J. ¶¶ 10-12.)

## III.   LEGAL STANDARDS

### A.   Admissibility of Expert Testimony

Under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and the Federal Rules of Evidence, a trial judge acts as a "gatekeeper" to ensure that "any and all expert testimony or evidence is not only relevant, but also reliable."  *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997).  The Federal Rules of Evidence embody a strong preference for admitting any evidence that may assist the trier of fact.  *Id.*; *see also* Fed. R. Evid. 401 (defining "relevant evidence," all of which is generally admissible, to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").  "Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (*citing Kannankeril*, 128 F.3d at 806).

Federal Rule of Evidence 702 provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient

> facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The Third Circuit has held that Rule 702 "embodies a trilogy of restrictions on expert testimony:  qualification, reliability and fit."  *Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  The court is required to exclude opinion testimony that does not meet these three requirements.  *Schneider*, 320 F.3d at 404 (*citing Daubert*, 509 U.S. at 592).  The proponent of the evidence bears the burden of establishing the existence of each factor by a preponderance of the evidence.  *Daubert*, 509 U.S. at 592.

The requirement of "qualification" requires "that the witness possess specialized expertise."  *Pineda*, 520 F.3d at 244 (*citing Schneider*, 320 F.3d at 404).  The Third Circuit interprets the qualifications requirement liberally, providing "that 'a broad range of knowledge, skills, and training qualify as an expert.'"  *Id.* (*quoting In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)).  "This liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts."  *Id.*   "[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."  *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996).

The requirement of "reliability" dictates that "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable."  *Pineda*, 520 F.3d at 247 (*citing Daubert*, 509 U.S. at 589).  The process is said to be reliable if it is "based on the methods and procedures of science rather than on subjective belief or unsupported speculation."  *In re Paoli*, 35 F.3d at 741-43.  A litigant must make more than a prima facie showing that his expert's methodology is reliable.  However, the Third Circuit has cautioned that

11

"[t]he evidentiary requirement of reliability is lower than the merits standard of correctness." *In re Paoli*, 35 F.3d at 744; *see also In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999) (stating that "the standard for determining reliability is not that high, even given the evidentiary gauntlet facing the proponent of expert testimony under Rule 702") (internal quotation marks and citation omitted).  In assessing the "reliability" of expert testimony, a court should consider:  (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.  *Pineda*, 520 F.3d at 247-48 (*citing In re Paoli*, 35 F.3d at 742 n.8).  A court has the discretion to consider other additional factors and to determine whether all of these designated factors must be considered in every case.  *Elcock v. Kmart Corp.*, 233 F.3d 734, 746 (3d Cir. 2000); *see also Pineda*, 520 F.3d at 247 (noting that the factors "are neither exhaustive nor applicable in every case") (citations omitted).

The final requirement is that the expert testimony must "fit" the issues in the case.  "In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact."  *Schneider*, 320 F.3d at 404.  "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  *Daubert*, 509 U.S. at 591-92.  "The adjective 'scientific' implies a grounding in the methods and procedures of science."  *Id.* at 590.  "Admissibility thus depends in part upon 'the proffered connection between the scientific research or test result to be presented and particular disputed

12

factual issues in the case.'  This standard is not intended to be a high one . . . ."  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000).  A court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used."  *Id.* (*citing Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)).  "A court may conclude that there is simply too great a gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

**B.**     **Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the nonmoving party's legal position.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The nonmoving party "cannot 'rely merely upon bare assertions, conclusory allegations or suspicions' to support its claim."  *Fin. Software Sys., Inc., v. Lecocq*, No. 07-3034, 2008 WL 2221903, at *2 (E.D. Pa. May 29, 2008) (*quoting Fireman's Ins. Co. v. DeFresne*, 676 F.2d 965, 969 (3d Cir. 1982)).  Rather, the party opposing summary judgment

13

must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. When deciding a motion for summary judgment, we must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995). However, we must not resolve factual disputes or make credibility determinations. *Siegel Transfer*, 54 F.3d at 1127.

## III.   LEGAL ANALYSIS

### A.   Defendant's *Daubert* Motions to Exclude Schloss's Testimony

Defendants contend that Schloss should not be permitted to testify as an expert because he is not qualified, his testimony is not based upon sufficient facts or data, his testimony is not the product of reliable principles and methods, and he has not applied any principles and methods reliably to the facts of the case.

#### 1.   *Schloss's Qualifications as an Expert*

Defendant SJP contends that Schloss is not qualified "to testify regarding the cause of a claimed accident involving a modern, state-of-the-art elevator system." (Doc. No. 25, Def. SJP's Mem. in Supp. of Mot. to Preclude 5.) Defendant SJP points to the fact that Schloss lacks the requisite education and training. (*See id.*) Schloss is not a licensed professional engineer, does not have a Master's Degree or a Ph.D., has not taken any courses in accident reconstruction, has never worked as a safety specialist for any elevator company or municipality, has not obtained certification as an elevator inspector, and has not actually serviced elevators since 1972. (Schloss Dep. 19, 27, 29-30, 37-39, 134.) Defendant SJP also points out that Schloss "has no direct, hands-on working experience" with the Lambda 3-D entrance protection system, which

14

"was not developed until after [Schloss] had retired.  (Doc. No. 25, Def. SJP's Mem. in Supp. of Mot. to Preclude 6; *see also* Schloss Dep. 118, 120.)[8]  Thus, Defendant SJP contends that "it is clear that [Schloss] is not qualified or competent to render any opinions regarding the particular elevator involved in this case."  (Doc. No. 25, Def. SJP's Mem. in Supp. of Mot. to Preclude 7.)

Plaintiff argues that Schloss is qualified to render an expert opinion.  Plaintiff asserts that Schloss has a Bachelor of Science degree in electrical engineering and serviced elevators for Westinghouse Elevator Company from 1958 to 1989.  (Doc. No. 34, Pl.'s Resp. 3; *see also* Schloss Dep. 19, 23.)  Plaintiff also points out that Schloss worked as a principal field consulting engineer for Schindler Elevator Corporation from 1989 to 1996, where he "worked on all aspects of installing, inspecting and maintaining elevators" and "participated in the writing and compiling of several manuals and guides on proper elevator inspection, maintenance, and safety."  (Doc. No. 34, Pl.'s Resp. 3; *see also* Schloss Dep. 23.)  Finally, Plaintiff argues that Schloss has over ten years of experience offering "expert opinion and testimony as they relate to issues involving elevators and escalators."  (Doc. No. 34, Pl.'s Resp. 3.)

We are satisfied that Schloss is qualified to testify as an expert under Rule 702.  *See* Fed. R. Evid. 702.  The Third Circuit has repeatedly noted the liberal standard used for qualifying experts.  *See Pineda*, 520 F.3d at 244 (noting that Rule 702 "has a liberal policy of admissibility") (citations omitted).  It is well settled that an expert cannot be excluded because the court does not deem the proposed expert to be the most qualified or because the proposed expert does not have the specialization the court considers to be the most appropriate.  *See*

---

[8] Schloss testified that he thinks that he may have inspected one Lambda 3-D door as a consultant but he could not say that it was the same model that is involved in this case.  (Schloss Dep. 120-122.)

*Holbrook*, 80 F.3d at 782 ("Who is 'best' qualified is a matter of weight upon which reasonable jurors may disagree.").  Indeed, "if the expert meets the liberal minimum qualifications then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril*, 128 F.3d at 809.  Schloss meets these "liberal minimum qualifications."  *See id.*  Schloss has technical training and experience in general elevator maintenance and repairs.  *See Hammond v. Int'l Harvester Co.*, 691 F.2d 646, 652 (3d Cir. 1982) (holding that engineer whose only qualifications were sales experience in the field of automotive and agricultural equipment and teaching high school automobile repair was nevertheless permitted to testify in a products liability action involving tractors).  Schloss has authored several articles about elevators and co-authored a book about elevator accident reconstruction litigation.  (Schloss Dep. 79-85.)  It is not necessary that Schloss have a Master's Degree or a Ph.D.  *See Hammond*, 691 F.2d at 652 (noting that "an individual need possess no special academic credentials to serve as an expert witness").  Though Schloss lacks "direct, hands-on working experience" with the Lambda 3-D door protection device, his general knowledge of elevator repair and maintenance gives him skill and knowledge "greater than the average layman."  *See Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (noting that "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman . . . .") (citations omitted).  Schloss's expertise in the field of elevators is sufficient to permit him to offer an expert opinion, notwithstanding his lack of experience with the specific technology at issue here.

> 2.    *The Reliability of Schloss's Methodology*

Schloss based his expert opinion on a review of the documents that Defendants produced during discovery, Elevator Maintenance Records and Access Card Records, Plaintiff's

deposition transcript, a telephone interview with Plaintiff in October 2008, and various elevator

codes.  (*See* Schloss Report 1.)  Schloss did not review all of the depositions in the case before

writing his report.  Rather, he reviewed only Plaintiff's deposition.  (Schloss Dep. 104.)  Schloss

concluded after reviewing these materials that the cause of Plaintiff's alleged accident must have

been improper preventative maintenance by Defendant Otis.  Schloss testified that he reached

this conclusion by using deductive reasoning:

> When I go through an accident reconstruction, which by the way I found out I am not
> a specialist in, I do deductive reasoning.  In other words, I don't know what
> happened, but I think of all of the things that could happen.
>
> . . .
>
> I use a deductive reasoning method and I put down all of the things that in my 50
> years of experience I know could cause that problem.  When I read discovery and
> looked at all the things that have been given to me, I started throwing out some of
> those, but there are a few that emerge to the top in a deductive manner that you can't
> exclude[.]

(Schloss Dep. 170-71.)  Schloss's expert report demonstrates this approach.  In his report

Schloss wrote that, generally, "[e]levator accidents can be caused by design defects, defective

manufacturing, defective installation, and misapplication."  (Schloss Report 2.)  Schloss then

dismissed these factors as the cause of the incident since the elevator was three years old.  (*Id.*)

Schloss also wrote that certain "external factors" such as "power outages, vandalism, and other

outside factors," including Plaintiff's negligence, can cause elevator accidents.  (*Id.* at 3.)

Schloss dismissed these factors since he found "no evidence of any such external factors."[9]  (*Id.*)

---

[9] Interestingly, Schloss appears to blame the accident at least in part on Plaintiff's own
conduct:

> Q:      Let me ask you this question, sir, one of the scenarios that could have caused
>          [Plaintiff's] accident would be if she stuck her arm between the doors as they

Finally, Schloss wrote that "improper maintenance is very often the root cause of elevator accidents," concluding that "an improperly adjusted or a malfunctioning door re-opening device and . . . excessive door energies caused the accident . . . ." (*Id.*)  Schloss offered five "accident reconstruction scenarios," one or more of which he claims "could have" caused the accident involving Plaintiff:

1.  The optical door reopening device was circumvented, i.e., prevented from performing its intended purpose for one or more of the following reasons:
    Shorted circuitry within the device controls
    Shorted outputs from the door controls
2.  Fault in the control relays for the door close & open circuitry
3.  Hatch door separation from the car door
4.  Limit cam failure in the door operator control box
5.  Stray or [i]ncident light impinging on the door reopening receiver.

(*Id.*; *see also* Schloss Dep. 225.)  Schloss developed the scenarios based on "observations, experience, and industry-accepted engineering analysis of the information available."  (Schloss Report 3.)

Schloss does not contend that any of these scenarios are based on facts or evidence. Regarding the first scenario – i.e., that the optical door reopening device was circumvented – Schloss testified as follows:

> Q:   Do you have any evidence that the optical door reopening device was
>
> _____
>
>     were closing, correct?
> A:   Well, that is correct.  That, apparently, is what [Plaintiff] did.
> . . .
> Q:   [Y]ou would agree with me that improper conduct by [Plaintiff] such as putting her arm between closing elevator doors also could have caused the accident, correct?
> A:   Well, it definitely did cause the accident. . . If she hadn't had done that, it wouldn't have happened.

(Schloss Dep. 175, 220.)

> desensitized or turned off completely before [Plaintiff's] accident?
>
> A:      No.
>
> Q:      Do you have any evidence, physical evidence, factual evidence that the optical door reopening device shorted out or that the circuitry shorted out?
>
> A:      No.
>
> Q:      Do you have any evidence that the – that with respect to the optical door reopening device that the output shorted out?
>
> A:      No.

(Schloss Dep. 221.)  Regarding the second scenario – i.e., a fault in the control relays and

circuitry – Schloss testified as follows:

> Q:      Do you have any specific evidence, factual evidence that there was a fault in the control relays for the door close and open circuitry?
>
> A:      No.
>
> Q:      Was the door close or open circuitry fixed or replaced as a result of the December 14, 2005 accident?
>
> . . .
>
> A:      I don't know.
>
> Q:      You don't have any evidence that it was?
>
> A:      No.

(*Id.* at 222-23.)  Regarding the third scenario – i.e., hatch door separation – Schloss testified as

follows:

> Q:      Do you have any physical evidence, any factual evidence that the hatch door separation occurred from the car door causing the accident?
>
> A:      No, and I don't have anything to say one way or another.
>
> Q:      Do you have any evidence that the hatch door was repaired or fixed or that the car door was repaired or fixed after the accident?
>
> A:      No.

(*Id.* at 223-24.)  Regarding the fourth scenario – i.e., a limit cam failure – Schloss testified as

follows:

> Q:      Do you have any physical evidence, any factual evidence that the limit cam failure device improperly worked, failed to function, anything like that?
>
> A:      No.

(*Id.* at 224.)  Finally, regarding the fifth scenario – i.e., stray or incident lighting impinging on

19

the door reopening receiver – Schloss testified as follows:

> Q:     Do you have any factual evidence that there was, in fact, any type of light that impinged upon the door reopening receiver?
> A:     No.

(*Id.* at 225.)  In short, Schloss's scenarios are hypothetical possibilities without any basis in fact.

Indeed, Schloss admitted that he does not know what caused the alleged incident involving

Plaintiff:

> Q:     [Y]ou can't say exactly what happened on December 14, 2005 to cause [Plaintiff's] accident, can you?
> A:     Bingo.
> Q:     Agreed?
> A:     Yes.

(*Id.* at 171-72.)

The scenarios are also not grounded on any testing, observation, or inspection.  Schloss

conducted no independent investigation into the cause of the alleged accident.  (*Id.* at 110-11.)

He did not inspect or test the subject elevator.  (*Id.* at 110.)  He did not perform "any tests of any

kind."  (Doc. No. 25, Def. SJP's Mot. to Preclude ¶ 14; Doc. No. 34, Pl.'s Resp. ¶ 14.)  In fact,

Schloss has never been to the Montgomery Corporate Center to view the site of the alleged

accident.  (Schloss Dep. 111.)  Schloss has no knowledge concerning the condition of the

elevator on the day that Plaintiff sustained her injuries.  More importantly, Schloss has never

tested any Lambda 3-D door opening devices like the device used on the elevator in question.

(*Id.* at 188.)  Schloss merely relies on documents listed in his report that Plaintiff's counsel

provided to him and a telephone interview that he conducted with Plaintiff three years after the

alleged accident.  He relies on no tests or studies, and his methods are not subject to any peer

review.

The Elevator Maintenance Records that Schloss reviewed do not point to any defect that was present in the subject elevator.  Schloss was unable to explain the undisputed fact that no repairs or remedial measures were necessary to restore the elevator to normal operation, since he "would have to be an expert to do that."  (*Id.* at 226-27, 247.)  Schloss therefore relies on the fact that the elevator doors "needed adjustment" on three dates prior to the alleged incident.  (*Id.* at 162.)  The dates of adjustment were June 8, October 20, and October 31, 2005.  (*Id.* at 163.)  Schloss could not say, however, that any of these three adjustments had "anything to do" with Plaintiff's accident:

> Q:    [Y]ou can't say as you sit here today whether the June 8, 2005 adjustment of the doors had anything to do with [Plaintiff's] accident, correct?
> A:    Correct.
> . . .
> Q:    So after June 8, 2005 there are adjustments to the doors to elevator number two at Montgomery Corporate Center performed by Otis representatives on October 20, 2005 and October 31, 2005; is that correct?
> A:    That's correct.
> Q:    And you can't say whether those adjustments of the doors at those two maintenance visits has anything to do with [Plaintiff's] accident, correct?
> Q:    That's correct.

 (*Id.* at 172-73.)  It is undisputed that none of the adjustments was related to a "fast closing door or a bad door detector."  (Davies Report 4; *see also* Schloss Dep. at 172-73.)[10]  Schloss

---

[10] Defendant Otis's expert, Thomas R. Davies, is a certified elevator inspector and elevator mechanic.  (*See* Davies Report.)  Davies analyzed each of the adjustments in his report.  (*See id.* at 3-4.)  He concluded that the first adjustment related to "second-floor hoist way doors not closing all the way" and was "not related to a fast closing door"; the second adjustment related to a "fourth-floor outside hoist way door not closing all the way" and was "not related to a fast closing elevator door"; and the third adjustment related to a "first floor outside hoist way door not closing all the way" and was also "not related to a fast closing elevator door."  (*Id.* at 4.)  Thus, "none of the . . . call backs had anything to do with a fast closing door or a bad door detector."  (*Id.*)  Schloss testified that he could "not recall" what necessitated the door adjustments.  (Schloss Dep. 168.)

nevertheless concluded that "the primary cause of [Plaintiff's] incident and subsequent injuries was improper preventive maintenance by Otis Elevator Company."  (Schloss Report 3.)

An expert's opinion cannot be based on unsupported speculation.  The case of *Oddi v. Ford Motor Company* is instructive.  *See* 234 F.3d at 147.  In *Oddi*, the plaintiff was injured when a bread truck he was driving struck a guardrail and a bridge abutment.  *Id.*  The plaintiff sued the manufacturer of the truck, claiming that a defective front bumper design allowed the underside of the truck to ride up or "ramp" onto the guardrail and strike the bridge abutment.  *Id.* at 140-41.  To support his theory of design defect, the plaintiff introduced the opinion of an engineer.  *Id.* at 146.  The engineer testified that the bumper design on the truck was defective and that the front bumper would not have ramped had it been strengthened with supports.  *Id.* at 147-48.  The engineer based his opinions in part on a review of the accident reports, photographs, witnesses' statements, the plaintiff's medical records, and the plaintiff's deposition testimony; and in part on his own "experience," "academic training," and "[r]esearch that [he does] almost on a continuous basis, reviewing technical literature."  *Id.* at 148.  However, the engineer conducted no tests to verify his theory and did not calculate the force that was inflicted on the truck by the guardrail at impact.  *Id.* at 149.  The engineer could not identify any particular literature that he relied upon to form any of the opinions contained in his report.  *Id.* at 148.  The district court excluded the engineer's testimony under *Daubert*.  *Id.* at 142.  The Third Circuit affirmed the exclusion of the engineer's testimony, reasoning that the engineer failed to demonstrate that his testimony was based on any reliable methodology:

> Since [the engineer] conducted no tests and failed to attempt to calculate any of the forces on [the plaintiff] or the truck during this accident, he used little, if any, methodology beyond his own intuition.  There is nothing here to submit to peer review, and it is impossible to ascertain any rate of error for [the engineer's]

22

> assumptions about the forces that caused [the plaintiff's] horrific injuries.  Similarly,
> no standards control his analysis, and no "gatekeeper" can assess the relationship of
> [the engineer's] method to other methods known to be reliable and the non-judicial
> uses to which it has been put.

*Id.* at 158.  The Third Circuit emphasized the fact that the plaintiff's expert never tested his

theory and did not perform tests or experimentation to support his conclusions:

> Essentially [the expert's] opinion . . . is based on nothing more than his training and
> years of experience as an engineer.  Although there may be some circumstances
> where one's training and experience will provide an adequate foundation to admit
> an opinion and furnish the necessary reliability to allow a jury to consider it, this is
> not such a case. . . . [The expert's] *ipse dixit* does not withstand *Daubert* scrutiny.

*Oddi*, 234 F.3d at 158; *see also Pappas v. Sony Elecs., Inc.*, 136 F. Supp. 2d 413, 426 (W.D. Pa.

2000) ("If *Daubert* and its progeny require anything, it is that plaintiffs come forward with proof

of a valid methodology based on more than just the *ipse dixit* of the expert."); *DiVittorio v.*

*United States*, 63 Fed. App'x 604, 607 (3d Cir. 2003) (unpublished opinion) (holding in a case

involving an elevator accident that the plaintiff's proffered expert based his opinion "simply on

conjecture" where the expert "did not . . . examine the elevator's safety features himself").

In the case of *Willis v. Besam Automatic Entrance Sys., Inc.*, No. 04-0913, 2005 WL

2902494, at *1 (E.D. Pa. Nov. 3, 2005) (Surrick, J.), *aff'd*, 228 Fed. App'x 246 (3d Cir. 2007),

we dealt with a situation similar in some respects to the instant case.  In *Willis*, the plaintiff

alleged that she was struck by the edge of a revolving door at the entrance to a hotel, causing her

to fall and suffer injuries.  *Id.*  The plaintiff further alleged that the revolving door continued to

rotate, pushing her on the floor.  *Id.*  The plaintiff offered expert testimony in support of the

negligence claims that she brought against the hotel and the company that contracted with the

hotel to maintain the revolving doors.  *Id.*  The expert had "never inspected the subject door or

its safety devices" and had "no knowledge concerning the condition of the revolving door on the

day that [the plaintiff] sustained her injuries." *Id.* at *5.  The expert conducted no independent

investigation and conceded that the plaintiff may have caused the accident.  *Id.*  We granted the

defendant's *Daubert* motion to preclude the expert from testifying.  We noted that the

"[proffered expert's] conclusions that [the plaintiff's] injuries were caused by [the defendants']

conduct does not derive from any testable hypothesis." *Id.* at *6.  We further noted that "[t]he

conclusions that [the proffered expert] draws from his review of the discovery materials are pure

speculation and conjecture." *Id.*  On appeal, the Third Circuit affirmed our decision to preclude

the expert from testifying.  *See Besam*, 228 Fed. App'x at 247.

Like the conclusions drawn by the experts in *Willis* and *Oddi*, Schloss's conclusions that

Plaintiff's injuries were caused by Defendants' conduct does not derive from any testable

hypothesis.  Schloss offered an opinion that the primary cause of Plaintiff's injuries was

"improper preventive maintenance by Otis Elevator Company." (Schloss Report 3.)  Yet Schloss

conducted no tests, made no observations, and performed no analysis to arrive at this conclusion.

He admitted that he does not know what caused the elevator doors to close suddenly.  He

admitted that Plaintiff's own negligence might have caused the accident.  He admitted that he

has no factual evidence that support any of his five "possible scenarios."  Those five scenarios

are nothing more than conjecture.  Schloss reasoned that power outages, vandalism, and other

external factors were not the cause of the alleged incident since "there is no evidence of any such

external factors." (Schloss Report 2.)  However, Schloss never inspected the subject elevator or

visited the premises to determine whether those factors did in fact cause the incident.  (Schloss

Dep. 110-11.)  Having ruled out these factors as possible causes, Schloss concluded that

improper maintenance must have caused the incident.[11]  Defendant Otis correctly observes that

Schloss "stat[es] that there is no independent evidence for these, but then uses that elimination to

conclude that the cause of the incident was improper maintenance, something for which

[Schloss] also presents no independent evidence."  (Doc. No. 22, Def. Otis's Mem. in Supp. of

Mot. for Summ. J. 11.)

"An 'expert's opinion must be based on the methods and procedures of science rather

than on subjective belief or unsupported speculation.'" *Oddi*, 234 F.3d at 158 (*quoting Paoli*, 35

F.3d at 742); *see also Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) ("[T]he

courtroom is not the place for scientific guesswork, even of the inspired sort.  Law lags science;

it does not lead it.  There may be evidence to back up [the expert's] claim, but none was

presented to the district court.").  Since an expert's "conclusions and methodology are not

entirely distinct from one another," *Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448

(3d Cir. 2003), a "court may conclude that there is simply too great a gap between the data and

---

[11] We note that the opinions of Defendants' experts contradict Schloss's speculation.  For example, Jon B. Halpern, a licensed professional engineer, examined the subject elevator and concluded that "the incident as described by [Plaintiff] requires that there are three independent failures of the elevator system. . . . It is highly unlikely that all three mechanisms failed simultaneously without any need to repair the same after the incident."  (Halpern Report 3.) Halpern observed that "the determination of the kinetic energy and closing force is an integral part of the state inspection as [Schloss] indicated in his own report[,] and the elevator passed the inspection [four months before the incident] indicating [that] the elevator was in full compliance with the code."  (*Id.*)  Thus, Halpern concluded that Schloss "has no basis for his conclusion" that a malfunctioning door re-opening device and excessive door energies caused the incident. (*Id.*)  In addition, Davies inspected the subject elevator and tested the door pressure and the Lambda 3-D door protection device.  (Davies Report 3.)  The tests showed no evidence of excessive door energies or any other electro-mechanical problem with the elevator doors.  (*Id.*) Davies noted that Elevator No. 2 "complied with all applicable codes and passed all required state inspections," and found "no independent evidence [that] the incident happened as [Plaintiff] described."  (*Id.* at 5.)

the opinion proffered," *General Electric v. Joiner*, 522 U.S. 136, 146 (1997).  Such is the case

here.  Schloss "used little, if any, methodology beyond his own intuition."  *Oddi*, 234 F.3d at

158.  Schloss's opinion appears to be based more on an instinctive reaction to the materials that

Plaintiff's counsel provided to him than on any testable hypothesis.  *See Bethea v. Bristol Lodge*

*Corp.*, No. 01-0612, 2002 WL 31859434, at *5 (E.D. Pa. Dec. 18, 2002) (excluding proffered

expert testimony where expert's "analysis appear[ed] to be no more than his instinctive reaction

to the materials provided").  Courts have rejected such approaches.  *See id.*  Schloss's

conclusions are unsupported by any evidence in the record.  As the Supreme Court noted,

"[i]nference is capable of bridging many gaps.  But not, in these circumstances, one so wide and

deep as this." *Galloway v. United States*, 319 U.S. 372, 386 (1943).  We are satisfied that

Schloss's *ipse dixit* does not withstand *Daubert* scrutiny.[12]

Finally, we note that Schloss's qualifications do little to enhance the reliability of his

proffered testimony.  Schloss had retired before the advent of the Lambda 3-D door reopening

device, which he described as a "state of the art" technology.  (Schloss Dep. 120, 272.)  Schloss

---

[12] We are not the first court to exclude the testimony of Ronald D. Schloss because of his methodology.  *See Vasil v. Trump Marina Hotel & Casino*, 2006 WL 941764, at *1 (N.J. Super. Ct. App. Div. Apr. 13, 2006) (unpublished opinion).  In *Vasil*, the plaintiff was ascending an escalator at an Atlantic City casino when a "jolt" allegedly caused him to lose his balance and fall.  *Id.*  The plaintiff brought a negligence claim against the casino and the elevator maintenance company that maintained the casino's escalators.  *Id.*  The plaintiff retained Schloss as an expert.  *Id.*  Schloss opined that "the reason for the jolt . . . was due to Otis Elevator [p]ersonnel in performing improper periodic maintenance on the escalator."  *Id.*  The trial court excluded Schloss's testimony and granted summary judgment in favor of the defendants, reasoning that Schloss's opinion "lacked any factual basis" and "was purely conjectured."  *Id.* at *2.  On appeal, the New Jersey Appellate Division affirmed, finding that "[t]he Schloss opinion . . . was not grounded in established facts."  *Id.*  The Appellate Division found "no factual or scientific basis for Schloss's opinion as to why [the plaintiff] fell" and therefore concluded that "the judge properly concluded the expert's speculative conclusions would not aid the trier of fact."  *Id.*

has never repaired, inspected, maintained, or worked on elevator doors that use this technology. (*See id.* at 118-19.)  Although Schloss meets the minimum qualifications for proffering expert testimony, his qualifications do not enhance the reliability of the methods he used here.

For all of these reasons, Schloss's testimony must be excluded.

## B.     Defendants' Motions for Summary Judgment

Defendants seek summary judgment on Plaintiff's Complaint in its entirety.  The parties agree that Pennsylvania law applies, and the incident occurred in Pennsylvania.  Under Pennsylvania law, "[i]n any case sounding in negligence, a plaintiff must demonstrate:  (1) a duty of care; (2) the breach of the duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the plaintiff."[13]  *Farabaugh v. Pa.*

---

[13] Nowhere in any of the documents filed by Plaintiff in this case did Plaintiff raise or discuss the application of the doctrine of *res ipsa loquitur*.  (*See* Compl.; *see also* Doc. Nos. 30, 31.)  Defendant Otis addressed the doctrine in its briefing, but Plaintiff did not address the doctrine in her response.  (*See* Doc. No. 22 at 12; Doc. No. 30.)  We will address the doctrine's application here since "[t]he *res ipsa loquitur* doctrine is simply a rule of evidence [that] is brought into play where the situation presented makes it applicable."  *Knight v. Otis Elevator Co.*, 596 F.2d 84, 90 (3d Cir. 1979) (citation omitted).

Under the doctrine of *res ipsa loquitur*, the fact-finder may "infer the cause of the injury from the circumstances of the event."  *Pace v. Mainstay Suites Hotel*, No. 06-5166, 2008 WL 4861507, at *4 (E.D. Pa. Nov. 7, 2008) (*citing Tait v. Armor Elevator Co.*, 958 F.2d 563, 572 (3d Cir. 1992)).  The *res ipsa loquitur* doctrine only applies when:  "(a) the event is of a kind which ordinarily does not occur in the absence of negligence; (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff."  *Id.* (*citing Gilbert v. Korvette, Inc.*, 327 A.2d 94, 100 (Pa. 1974) (adopting the Restatement (Second) of Torts § 328D)).  "It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn."  *Id.*

The doctrine of *res ipsa loquitur* is not applicable here since "other responsible causes," including the conduct of Plaintiff, have not been "sufficiently eliminated by the evidence."  *See Tait*, 958 F.2d at 572.  The parties offer expert testimony that acknowledges the existence of other causes of the incident such as Plaintiff's conduct.  Schloss, the expert proffered by Plaintiff, acknowledged that "external factors" such as "power outages, vandalism, and other outside factors" including Plaintiff's negligence, could have caused the accident.  (*See* Schloss

*Turnpike Com'n*, 911 A.2d 1264, 1272-73 (Pa. 2006) (*citing R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005)).

We will evaluate Plaintiff's claim under traditional negligence principles as to each Defendant, individually.

####    1.    *Defendant SJP's Duty to Plaintiff*

Defendant SJP asserts that its duty to Plaintiff is congruent with "the terms of the property management contract" with the owner of the Montgomery Corporate Center.  (Doc. No. 23, Def. SJP's Mem. in Supp. of Mot. for Summ. J. 8.)  Defendant SJP asserts that it did not breach any duty owed to Plaintiff since Defendant SJP "went well beyond the standard of care required of it as a property manager" by hiring Defendant Otis "to regularly inspect and maintain the elevators."  (*Id.*)  Defendant SJP further asserts that it "was never given notice that a dangerous condition existed at the time of Plaintiff's claimed incident," and that "the law is clear that absent notice of a claimed dangerous condition, there is no basis to sue [Defendant SJP]." (*Id.* at 11.)

The parties do not dispute Plaintiff's status as a business invitee.  A business invitee is "a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land."  Restatement (Second) of Torts § 332(3)

---

Report 3.)  Halpern stated in a report that "[t]he most likely cause of the incident is that [Plaintiff] tried to enter the elevator when the doors were already closing."  (Halpern Report 3.)  Dinoff stated in a report that if Plaintiff was caught in the elevator doors, it was the result of Plaintiff's "decision to thrust her arms into the doors as they approached being fully closed, and not of any defects in the elevator operation."  (Dinoff Report 8.)  Other responsible causes have "not been sufficiently eliminated by the evidence."  *See Gilbert*, 327 A.2d at 100; *cf. Knight*, 596 F.2d at 90-91 (remanding for jury to consider the negligence of elevator maintenance company under *res ipsa loquitur* where "[t]here was no evidence that the plaintiff contributed in any way to the accident").

(1965).  "Pennsylvania has adopted Restatement (Second) of Torts § 343 (1965) describing what duties a possessor of land owes a business invitee."  *Clark v. Fuchs*, No. 93-1422, 1994 WL 13847, at *2 (E.D. Pa. Jan. 14, 1994), *aff'd*, 39 F.3d 1168 (3d Cir. 1994) (*citing Moultrey v. Great A. & P. Tea Co.*, 422 A.2d 593, 595 (Pa. Super. Ct. 1980)); *see also Blackman v. Fed. Realty Inv. Trust*, 664 A.2d 139, 142 (Pa. 1995) (noting that Restatement Section 343 "has been adopted by the Pennsylvania courts").  The Restatement provides that a possessor of land is subject to liability for physical harm caused to business invitees by a condition on the land if but only if the possessor:

> (a)    knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b)    should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c)    fails to exercise care to protect them against the danger.

Restatement (Second) of Torts § 343 (1965).  Facts indicating notice can include the previous occurrences of the condition or the length of time the condition exists.  *See Katz v. John Wanamaker Phila., Inc.*,112 A.2d 65, 67 (Pa. 1955); *Moran v. Valley Forge Drive-In Theater*, 246 A.2d 875 (Pa. 1968).

The mere existence of a dangerous condition or the occurrence of an accident does not give rise to the presumption of negligence.  *See Martino v. Great A. & P. Tea Co.*, 213 A.2d 608, 610 (1965) ("No citation of authority is necessary to support the hornbook proposition that the mere happening of an accident does not impose liability on any party."); *Moultrey*, 422 A.2d at 596 (holding that an invitee must prove either that the possessor of the land had a hand in creating the harmful condition, or that the possessor had actual or constructive notice of such condition).  The case of *Loncosky v. Wal-Mart Stores, Inc.*, is instructive.  *See* No. 96-4688,

1997 WL 732465, at *2 (E.D. Pa. Nov. 24, 1997).  In *Loncosky*, the plaintiff tried to exit the defendant's store through one of several main doors.  *Id.* at *1.  The doors could be pushed open by pressing on a metal handle.  *Id.*  The handle "looked and felt normal" when plaintiff touched it.  *Id.*  Nevertheless, the handle came loose and fell as the plaintiff placed his hand on it.  *Id.*  As a result, the plaintiff lost his balance and fell to the ground, injuring his knees.  *Id.*  The plaintiff filed a negligence action against the store, and the defendant sought judgment as a matter of law after the presentation of evidence at a jury trial.  The court observed that the "evidence shows that a moment before the accident the handle appeared and felt normal," and that "[the plaintiff] had visited the store at least twice before" and "exited and observed others exit from the same door without any problem."  *Id.*  The court further observed that the plaintiff presented no evidence of "any prior complaints or service reports regarding similar problems with [the] doors or door handles."  *Id.* at *4 n.5.  The court therefore granted the defendant's motion for judgment as a matter of law, reasoning that "[t]here was no evidence to show that [the] defendant knew of the weakness in the bar handle or could have learned of this by a reasonable inspection, visual or physical."  *Id.* at *2.

As in *Loncosky*, here there is no evidence to show that Defendant SJP knew of any problems with the elevator doors closing suddenly or could have learned of any such problems by a reasonable inspection, visual or physical.  Plaintiff testified that she observed nothing unusual as the elevator doors opened.  Plaintiff had used the same elevator doors "thousands of times" without any problem.  *See Loncosky*, 1997 WL 732465, at *2 (granting summary judgment in favor of the defendant where "[the plaintiff] had visited the store at least twice before" and "exited and observed others exit from the same door without any problem").  There

30

is no evidence here of any prior complaints or service reports or any subsequent complaints or service reports regarding similar problems with the doors. *Cf. Williams v. Otis Elevator Co.*, 598 A.2d 302, 304 (Pa. Super. Ct. 1991) (holding that the evidence "was sufficient to permit a jury to find that Otis had negligently performed its contract to maintain the elevator" where "the 'call back' maintenance record . . . revealed a steadily increasing number of reported problems"). It is undisputed that, except for Plaintiff's report, there were no reports of the elevator doors suddenly closing on anyone in the history of the Montgomery Corporate Center. Elevator No. 2 passed all state inspections, including an inspection four months before the alleged incident. The incident that involved Plaintiff on December 14, 2005, stands alone. (*See* Doc. No. 31, Pl.'s Resp. to Def. Otis's Mot. for Summ. Judg. ¶ 11) (admitting that "prior to [Plaintiff's] claimed accident, there were never any known or reported instances or claims of the doors on Elevator No. 2 closing on anyone, for any reason.")[14]

Defendant SJP is not an insurer of Plaintiff's safety. Summary judgment is appropriate on Plaintiff's negligence claim for the same reason that judgment as a matter of law was

---

[14] Plaintiff also argues – based on Schloss's purported testimony, and without citation – that Defendant SJP "had numerous non-delegable [sic] responsibilities associated with the elevators, including, but not limited to, turning the power on and off to the elevators on a daily basis" and checking "car door operation . . . at least every two months." (Doc. No. 34, Pl.'s Resp. 2; Schloss Dep. 219-20.) Schloss testified that according to an Elevator Maintenance Manual authored by Zack McCain, elevator doors "should be checked at least every two months." (Schloss Dep. 219-20.) However, Schloss did not testify about "non-delegatable duties." Even if he had, and even if Schloss's testimony were admissible, Plaintiff cites no cases that suggest that Defendant SJP, a property manager, owed Plaintiff a non-delegable duty. Further assuming, *arguendo*, that Defendant SJP owed a non-delegable duty to Plaintiff to turn the power on and off on a daily basis or to check the car doors "every two months," there is no evidence in the record that Defendant SJP's alleged failure to take these actions resulted in the elevator doors suddenly closing on Plaintiff. Plaintiff's reliance on Schloss's purported testimony is misplaced.

appropriate in *Loncosky*:  after viewing and construing the evidence most favorably to the

nonmoving party, there is no legally sufficient evidentiary basis for a reasonable jury to find for

Plaintiff on the claim.  *See* 1997 WL 732465, at *1 (*citing McDaniels v. Flick*, 59 F.3d 446, 453

(3d Cir. 1995)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("The standard for

granting summary judgment mirrors the standard for a directed verdict under Federal Rule of

Civil Procedure 50 (a).").  Plaintiff must provide evidence that would allow a jury to conclude

that Defendant SJP's negligence is to blame.  Construing all the facts and inferences in favor of

Plaintiff, a jury cannot so conclude.

### 2.     *Defendant Otis's Duty to Plaintiff*

Defendant Otis contends that its duty to Plaintiff "is congruent with Otis's obligations

under the maintenance contract [with Defendant SJP]."  (Doc. No. 22, Def. Otis's Mem. in Supp.

of Mot. for Summ. J. 6-7.)  The maintenance contract required Defendant Otis to provide regular

elevator maintenance and to repair any elevator malfunctions or dangerous conditions reported to

it by Defendant SJP.  (*See* Doc. No. 23, Ex. 2, Contract between Def. SJP and Def. Otis, May 3,

2002.)  Defendant Otis contends that it did not breach any duty to Plaintiff.  Defendant argues

that Plaintiff has offered "no evidence that Otis failed to inspect and maintain the elevator or that

any malfunction in the subject elevator could have been foreseen or prevented by more zealous

maintenance."  (Doc. No. 22, Def. Otis's Mem. in Supp. of Mot. for Summ. J. 8.)

There is no special relationship, such as land owner and invitee, between Plaintiff and

Defendant Otis.  However, Defendant Otis had a contractual duty to maintain and repair the

elevator in which Plaintiff allegedly suffered injury.  Accordingly, Defendant Otis owed a duty,

"imposed by law and society, to perform its contractual obligations in such a manner as to avoid

injury to third parties" such as Plaintiff.  *Farabaugh*, 911 A.2d at 1283; *see also id.* (noting that "[t]he extent of the duty and the subsequent questions of breach and causation remain to be measured by 'the nature and scope of [the] contractual undertaking'") (*quoting Evans v. Otis Elevator Co.*, 168 A.2d 573, 576 (Pa. 1961)).  Defendant Otis was required by contract to "periodically examine safety devices" and conduct a variety of annual tests on the elevators. (*See* Doc. No. 23, Ex. 2, Contract between Def. SJP and Def. Otis, May 3, 2002.)  In addition, Defendant Otis was required to install a microprocessor system that monitors the elevators and notifies a dispatching center if any elevator is inoperative.  (*See id.*)  It is undisputed that Defendant Otis complied with its contractual obligations by performing the annual tests and installing a computer monitoring system.  Neither the annual tests nor the computer monitoring system identified a dangerous condition like the one Plaintiff described.  Plaintiff offers no evidence that Defendant Otis could have foreseen or prevented the elevator doors from suddenly and unexpectedly closing on Plaintiff, whether through more zealous maintenance or otherwise. There is simply no evidence in the record that the alleged dangerous condition was "discoverable by reasonable inspection."  *Evans*, 168 A.2d at 576.  Thus, even if Defendant Otis failed to comply with one or more of its contractual duties, such non-compliance could not subject Defendant Otis to liability to Plaintiff for negligence.

## IV.   CONCLUSION

For all of these reasons, Defendants' Motions will be granted.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JADA JOHNSON                          :
                                      :                    CIVIL ACTION
            v.                        :
                                      :                    NO. 07-5545
SJP MANAGEMENT LLC, ET AL.            :

## <u>ORDER</u>

AND NOW, this  12th  day of February, 2009, upon consideration of Defendants'

*Daubert* Motions to Preclude Plaintiff's Expert, Ronald D. Schloss, from Testifying at Trial

(Doc. Nos. 25, 28), Defendants' Motions for Summary Judgment (Doc. Nos. 22, 23), and all

papers submitted in support thereof and in opposition thereto, it is ORDERED that Defendants'

Motions are GRANTED and Plaintiff's Complaint is DISMISSED.

IT IS SO ORDERED.

BY THE COURT:

_____
R. Barclay Surrick, J.